E-FILED; Baltimore County Circuit Court
Docket: 10/8/2026 4:51 PM; Submission: 10/8/2026 4:51 PM
Envelope: 28632044

| | | |
|---|---|---|
| REGINA E. RICHARDSON<br>6705 Carol Road<br>Baltimore, Maryland 21207 | * | IN THE |
| ROBERT E. POLLARD<br>6924 Myersview Drive<br>Middle River, Maryland 21220 | * | CIRCUIT COURT |
| Plaintiffs, | * | FOR |
| v. | * | BALTIMORE COUNTY |
| LOANDEPOT.COM, LLC<br>6561 Irvine Center Drive<br>Irvine, California 92618 | * | Case No.: C-03-CV-26-004770 |
| Serve on:<br>Registered Agent Solutions, Inc.<br>Suite 2424<br>401 East Pratt Street<br>Baltimore, Maryland 21201 | * | |
| Defendant. | * | |

* * * * * * * * * * * * *

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

This is a complaint brought by Regina E. Richardson and Robert E. Pollard by and on behalf of all those similarly situated Maryland residents who have obtained a mortgage through loanDepot.com, LLC ("loanDepot")'s Consumer Direct Division, and in support state the following:

**NATURE OF THE ACTION**

1. This is a class action arising from loanDepot's deployment of a sophisticated, company-wide practice of willfully violating the loan officer compensation laws set forth in the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq.

2. loanDepot has engaged in a coordinated set of illegal lending practices in its Consumer Direct Division by incentivizing loan production staff to sell loans with higher rates and fees in violation of Regulation Z.

3. loanDepot has been engaging in a years-long unlawful and unfair pattern and practice of systematically violating the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et seq., as implemented by Regulation Z, 12 C.F.R. Part 1026, by creating prohibited incentives that link the compensation paid to its production staff in its Consumer Direct Division to the terms of loans offered to its consumers.

**THE PARTIES**

4. Plaintiff Regina Richardson is a resident of Baltimore County, Maryland. Ms. Richardson is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loan she obtained was primarily for personal, family, or household purposes.

5. Plaintiff Robert Pollard is a resident of Baltimore County, Maryland. Mr. Pollard is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loan he obtained was primarily for personal, family, or household purposes.

6. loanDepot.com, LLC is a Delaware limited liability company whose principal place of business is located at 6561 Irvine Center Dr., Irvine, CA 92618, in Orange County, California. It operates both a retail loan origination channel and a Consumer Direct lending channel. While both lending divisions are part of loanDepot, their business models are different. This action only involves loanDepot's Consumer Direct lending channel.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over this action pursuant to 402(d)(1)(i)-(ii) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland.

8. This Court has personal jurisdiction over Defendant pursuant to Md. Cts. & Jud. Proc. 6-103 (b) (1) and 6-103 (b)(2) as Defendant transacts business in this state giving rise to the instant cause of action.

9. Venue is proper under Md. Cts. & Jud. Proc. 6-201 and 6-202 as Defendant regularly carries on business in Baltimore County and the Plaintiffs reside in Baltimore County.

## FACTUAL ALLEGATIONS

*History and Purpose of the Loan Officer Compensation Rule*

10. TILA's Regulation Z prohibits a lender from linking compensation of licensed production staff soliciting and selling residential mortgage loans to the interest rates or fees charged to consumers. This prohibition, known as the loan officer compensation rule, was established following the subprime lending crisis and the Great Recession of 2008. The Great Recession of 2008 and "the mortgage market crisis focused attention on the critical role the loan officers and mortgage brokers play in guiding consumers through the loan origination process."[1]

11. Prior to the loan officer compensation rule, "the higher the interest rate on the loan or the more in upfront charges the consumer pays to the creditor (or both), the greater the compensation available to the loan originator. This created a situation in which the loan originator had a financial incentive to steer consumers into the highest interest rate possible or to impose on the consumer additional upfront charges payable to the creditor."[2] As the Federal Reserve Board recognized, loan originators had an undisclosed financial incentive adverse to the interest of the

---

[1] Bureau of Consumer Financial Protection, *Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z) Final rules; official interpretations*, 78 Fed. Reg. 11284 (Feb. 15, 2013).

[2] Fed. Reg. 11286 (Feb. 15, 2013)

borrower. *See* Federal Reserve System, *Truth in Lending: Final rule; official staff commentary,* 75 Fed. Reg. 58509, 58510 (September 24, 2010).

12. As recognized by both the Consumer Financial Protection Bureau ("CFPB") and the Federal Reserve Board, the functional lack of transparency in shopping for a mortgage limited the viability of a truly competitive market. *See id.* Both the CFPB and the Federal Reserve Board also noted that due to the complexity of residential mortgage products, the limitations inherent in shopping for mortgages, and consumers' lack of experience and/or understanding, consumers had little choice but to rely on the goodwill of the lender and loan originator to ensure they were getting the best price available. *See id.* at 11284.

13. Congress and the CFPB determined therefore that an incentive to increase loan terms was both improper and dangerous to consumers:

> In a perfectly competitive and transparent market, competition would ensure that this incentive would be countered by the need to compete with other loan originators to offer attractive loan terms to consumers. However, the mortgage origination market is neither always perfectly competitive nor always transparent, and consumers (who take out a mortgage only a few times in their lives) may be uninformed about how prices work and what terms they can expect. This compensation structure was problematic … because the loan originator had an incentive to steer borrowers into less favorable pricing terms…[3]

14. As a result, following the 2008 recession, the Dodd-Frank financial reforms amended TILA to provide that:

> For any residential mortgage loan, no mortgage originator shall receive from any person and no person shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the terms of the loan (other than the amount of the principal).

---

[3] *Id.*

15 U.S.C. § 1639b(c)(1) (hereinafter referred to as the "Loan Officer Compensation Rule" or "LO Comp Rule").

15. The purpose of the LO Comp Rule was to render mortgage loan originators agnostic to the interest rates and fees paid by consumers to whom they were selling loans. Indeed, the LO Comp Rule allows loan officers to be compensated based on the number of loans sold and/or the aggregate volume of loans sold so that a loan officer would be incentivized to provide borrowers the best terms available from the lender up front. Since the loan officers could not be incented to sell loans with higher rates or fees, the only financial incentive would be the total volume of loans sold. This would discourage a loan officer from doing anything but offer the best loan terms up front, which would expedite the sale of loan products and thereby maximize the loan officers' compensation. Offering anything but the best rates and terms upfront would be counterproductive to the loan officers' personal financial incentives.

16. Further, because the compensation to a loan officer became fixed after the LO Comp Rule was in effect, a lender could only reduce loan pricing by reducing its profit margin on the loan—it could no longer reduce the commission payable to the loan officer to improve pricing. And since there were no incentives to originate loans with enhanced profitability, a lender complying with the rule would not have excessive profits on some loans to offset deep discounts on others. Thus, the LO Comp Rule was designed to lead to more transparent and consistent loan terms offered to similarly situated borrowers.

*The LO Comp Rule Applies to Managers and Team Based Compensation*

17. The LO Comp Rule applies to the activities of any employee who "takes an application, offers, arranges, assists a consumer in obtaining or applying to obtain, negotiates, or otherwise obtains or makes an extension of consumer credit for another person." 12 C.F.R. §

1026.36(a)(1)(i). Indeed, any employee of a creditor who, "advis[es] on particular credit terms that are or may be available to [a] consumer based on the consumer's financial characteristics" is covered by the LO Comp Rule as is an employee "presenting particular credit terms for the consumer's consideration that are selected based on the consumer's financial characteristics, or communicating with a consumer for the purpose of reaching a mutual understanding about prospective credit terms." *See* 12 C.F.R. § 1026.36 cmt. 36(a)(1)(i)(A)(3) and (4).

18. As such, employees who manage but remain engaged in negotiating credit terms, assisting in the application process, approving loan terms, or discussing loan terms upon the extension of credit are subject to the LO Comp Rule and may not be compensated based on the profitability of loans closed by them or by those they supervise:

> The definition of loan originator includes persons, including managers, who are employed by a creditor or loan originator organization and take an application, offer, arrange, assist a consumer with obtaining or applying to obtain, negotiate, or otherwise obtain or make a particular extension of credit for another person, even if such persons are also employed by the creditor or loan originator organization to perform duties that are not loan origination activities. Thus, such producing managers are loan originators.

12 C.F.R. § 1026.36 cmt. 36(a)(4)(v).

19. Moreover, the bar on term-linked compensation applies not only to the loans directly originated by a loan officer or manager, but also to all loans originated collectively by teams of individuals performing loan origination activities:

> [I]n connection with a consumer credit transaction secured by a dwelling, no loan originator shall receive and no person shall pay to a loan originator, directly or indirectly, compensation in an amount that is based on a term of a transaction, the terms of multiple transactions by an individual loan originator, or the terms of multiple transactions by multiple individual loan originators.

12 C.F.R. § 1026.36(d)(1)(i). Such "team Based" compensation would create the same steering risks as individual transaction-based compensation:

> [P]rofit-sharing plans or non-qualified plans may reflect transaction terms of multiple individual loan originators taken in the aggregate. Consequently, these types of compensation programs create potential incentives for individual loan originators to steer consumers to particular transaction terms based on the interests of the loan originator rather than the consumer, which is one of the fundamental problems that TILA section 129B(c) and the existing regulation are designed to address.

*Id*. at 11337.

*loanDepot Violated the LO Comp Rule by Paying Production Managers Based on the Terms of Loans Sold by their Production Teams*

20. loanDepot systematically violated the LO Comp rule on a company-wide basis by incentivizing its Production Managers – who were responsible for both originating loans and overseeing teams of loan officers – to steer consumers into loanDepot's maximally priced, profit-optimized loans, and cutting compensation for any Production Manager who failed to do so.

21. According to Regulation Z's official comments, if "the objective facts and circumstances indicat[e] that compensation would have been different if a transaction term had been different [,]" then there is a violation of the LO Comp Rule. *See* 12 C.F.R. § 1026.36 cmt. 36(d)(1)(i).

22. loanDepot's unlawful compensation scheme is memorialized in its official "Production Manager Compensation Plan" (the "Plan"), a copy of which is attached hereto as Exhibit 1. Specifically, the Plan provides that Production Managers earn monthly incentive compensation–above their base salary–based upon the terms of the loans they close directly or through their subordinate loan officers. *See id*. at 1-2. This monthly incentive compensation is called the "Team Bonus." *Id.* at 2. Importantly, each Production Manager's "Team Bonus" is made up of a series of calculations, which include "Pricing Exceptions" ("PE")–defined as, "[a] reduced price offered to the customer that is less than the base price in our system." *Id.* By linking

a Production Manager's Team Bonus to "Pricing Exceptions," loanDepot is–by definition–violating TILA on a system-wide basis.

23. And though Production Managers are paid based on the profitability of the loans sold by their teams, loanDepot nonetheless requires its Production Managers to engage in origination activities, specifically requiring them to approve, recommend, and at all times minimize the extent of any discounts offered on the loans sold by their teams of loan officers.

24. Production Managers spend approximately fifty percent (50%) of their time engaged in sales activities directly with consumers. Production Managers engage in all the same activities with these consumers as loan officers. Indeed, Production Managers negotiate rates and terms with customers, structure deals with customers, and recommend products to customers. In fact, most borrowers who seek a discount in loan terms are referred to these Production Managers, whose jobs are to minimize or avoid providing discounts altogether.

25. Production Managers also decide when and whether to provide pricing concessions when demanded by customers who have been contacted by loanDepot about a potential loan scenario. Pricing concessions include reductions in interest rates and/or reductions in upfront loan fees. Production Managers also resell loans when problems associated with a file may require a restructuring of the loan midstream. When that happens, the new terms must be sold to, and negotiated with, the consumers.

26. Production Managers are also required to engage with consumers as a "second voice" when their subordinate loan officers fail to convince consumers to purchase maximally priced, profit-optimized loans. A "second voice" merely means an escalation of the same sales activities loan originators perform reinforced by more experienced Production Managers, who perform the exact same duties with respect to that consumer.

27. This second level sales practice is often associated with loanDepot's initial pricing, which was often higher than competing offers. Customers who shop with multiple lenders and obtain better terms through a competitor are escalated to Production Managers in an effort to get the borrower to move forward with loanDepot notwithstanding its inflated pricing. If that is not possible, Production Managers have limited authority to grant pricing concessions (reductions in interest rate or upfront fees) and they are expected to convince consumers to move forward with loans with minimal concessions within their authority. Additionally, Production Managers have the ability to seek approval from their managers when necessary. However, the more discounts are approved/sought by Production Managers, and the more frequent those concessions are provided, the less a Production Manager earns from the loans closed by his team, creating a powerful incentive to maintain the highest pricing on loans offered to consumers in violation of the Loan Officer Compensation Rule.

28. The following former loanDepot employees attested to these facts in the attached Declarations.[4] Ben Kelley ("Kelley") was a Vice President of loanDepot from 2019-2021 and subsequently became a loanDepot Senior Vice President. *See* Kelley Decl. at ¶ 1, attached hereto as Exhibit 2. Kelley oversaw teams of Production Managers and confirmed that Production Managers were expected to spend approximately half their time engaged in selling loans to consumers, negotiating loan terms, structuring loans, and convincing customers to move forward with loanDepot instead of its competitors. *Id.* at ¶ 2. Production Managers were financially incented not to approve pricing concessions and instead convince customers to proceed without

[4] The Declarations were filed in connection with a competing lender's unfair competition claim against loanDepot, *West Capital Lending, Inc. v. loanDepot.com, LLC*, No. 8-26-cv-00522-JDE, U.S. District Court (W.D. Ca.), based on the same TILA violations alleged here.

reductions to rates and fees. *Id.* at ¶¶ 3-4. Mr. Kelley similarly recalled frequent changes to Production Managers' compensation but that a constant in every compensation package was the effect of concessions and discounts on Production Managers' pay. *Id.* at ¶ 4.

29. Kyle Fleeger ("Fleeger") started his employment with loanDepot in 2016 and worked there until November 2025. *See* Fleeger Decl. at ¶ 1, attached hereto as Exhibit 3. Fleeger's most recent position was Vice President of Direct Lending. *Id.* Throughout Fleeger's tenure at loanDepot, he directly and indirectly supervised Production Managers and also served as a Production Manager for a short period. *Id.*

30. According to Fleeger, Production Managers were responsible for driving their teams' sales by coaching loan officers, communicating with customers, and serving as a second voice on sales calls. *Id.* at ¶ 2. If a loan officer had problems closing a sale, they escalated the call to a Production Manager, who then acted as a second voice on the sales call, reinforcing the loan officer's position, communicating with the customer, and reviewing the customer's profile and application to determine whether to provide any discounts in loan terms, accept customers' requests on terms, and generally negotiate the terms of the loan with the customer. *Id.* Through these efforts, Production Managers typically reviewed not only the loan application but also the customer's entire loan file to understand their profile. *Id.*

31. Production Managers also filled in for loan officers from time to time, for example if a customer called in when a loan officer was not available or the only time convenient for a customer did not work with a loan officer's schedule. *Id.* at ¶ 3. In those cases, a Production Manager helped complete the loan application from the loan officer's loan portal for the loan officer and e-signed the loan officer's name to the application. *Id.*

32. Production Managers also had to restructure loans, reviewing the terms and conditions and modifying them when problems arose. *Id.* at ¶ 4. In those cases, Production Managers reviewed the entire file and loan application, modifying the terms as needed to allow the loan to proceed, essentially presenting the revised loan terms to the customer. *Id.*

33. loanDepot maintained a "no steering policy," and loan officers told customers that they were not compensated based on the terms of their loan because of that policy. *Id.* at ¶ 7. However, Production Managers' pay was affected by the amount of revenue their teams generated on the loans the teams originated. *Id.* As such, Production Managers' pay was directly affected by the terms of loans they sold, including the rate, and the terms of loans in which they assisted their teams in selling to customers. *Id.*

34. Enrique Cotto ("Cotto") was a loan officer who reported to at least three different Production Managers during the course of his employment at loanDepot from 2019 to 2026. *See* Cotto Decl. at ¶ 1, attached hereto as Exhibit 4. Cotto was also offered on multiple occasions the opportunity to become a Production Manager. *Id.* at ¶ 2. Cotto confirmed both from his experience working with multiple Production Managers, as well as from conversations with executives offering him the position, that the Production Managers' job was "second level" sales. *Id.* at ¶ 3. That is, Production Managers were expected to follow up with customers and attempt to convince them to proceed with loans based on the terms and rates offered and discourage discounting loans through pricing exceptions, as well as make decisions on terms customers requested. *Id.* at ¶ 4. Although Mr. Cotto had less transparency into Production Managers' compensation, he knew that the more consumers' loan terms were discounted, the less Production Managers earned. *Id.* at ¶ 5.

35. loanDepot required Production Managers to influence their sales teams to drive loanDepot's initial pricing (called "par" pricing) and discourage discounts. When customers–typically after having connected with competitors–pushed back on the price, Production Managers were supposed to use their sales skills to convince customers to move forward on the original terms. Only if the Production Manager was unsuccessful and determined it was prudent to offer a pricing concession would Production Managers then authorize – or for larger pricing exceptions recommend and seek approval for – a reduction in loan terms. However, the greater the extent and frequency of rate/fee reductions, the less Production Managers earned.

*loanDepot Violated the LO Comp Rule to set Initial Loan Pricing*

36. Because loanDepot's initial pricing in the Consumer Direct Division was routinely higher than competitors, it was often the case that concessions in pricing were required when customers sought loan offers from competitors. *See* Declaration of Kevin Wong ("Wong") at ¶ 3, attached hereto as Exhibit 5; Declaration of Shawn Way ("Way") at ¶ 3, attached hereto as Exhibit 6; Declaration of David Harned ("Harned") at ¶ 3, attached hereto as Exhibit 7.

37. Indeed, Wong, who held a Production Manager position up until approximately 2022, confirms that one of the main reasons he would speak to consumers was because the original price offered to consumers was often higher than what competitors were offering. It was then his job as a Production Manager to minimize the amount of the concessions needed to convince the borrowers to move forward with a loan. In fact, his compensation was structured to specifically reward him for offering smaller concessions to borrowers and offering those concessions less frequently. *See* Wong Decl. at ¶ 4-5.

38. Harned stated that it was a nearly daily occurrence that he would be asked to speak to customers who received written offers from competitors with terms more favorable than those

initially offered by loanDepot, and that it was his job to get those borrowers to move forward without concessions or with the smallest concessions on loan terms possible. The more concessions he offered and the larger the concessions offered to consumers, the more his compensation was adversely affected. *See* Harned Decl. at ¶ 3-4.

39. Wong specifically declared under oath that "loanDepot's business model was to price loans higher at the outset and then reduce the price as needed to match competitors if and when a customer provided a loan estimate with a lower rate and/or upfront fees." *See* Wong Decl. at ¶ 3. Hence, loanDepot's entire purpose in establishing the duties and compensation of Production Managers was to undermine the pricing transparency for which the LO Comp Rule was designed. Rather than have production staff whose only incentive was to sell as many loans as possible without regard to loan terms, loanDepot's structure facilitated a multi-tiered pricing structure where borrowers would be offered higher terms initially, and those persons responsible for the teams could adjust the terms but only to the detriment of their compensation. As a result, loanDepot's compensation structure created financial incentives for Production Managers to discourage pricing concessions and to maintain the initial loan terms offered to consumers, without regard to whether those consumers ultimately obtained loans on competitive terms.

40. Consistently, loanDepot former employees–although operating under the belief that the Company highly valued compliance and had specifically validated the legality of its compensation practices–felt it was unfair that Production Managers had to sacrifice their compensation to sell loans to match the terms offered by loanDepot's competitors because loanDepot's par pricing was often higher than those competitors. *See* Way Decl. at ¶¶ 3-5, Wong Decl. at ¶¶ 3, 5, 7, Harned Decl. at ¶¶ 3-4, 7.

## FACTUAL ALLEGATIONS RELATED TO THE INDIVIDUAL CLASS REPRESENTATIVES

41. Plaintiff Regina Richardson obtained a loan from loanDepot through its Consumer Direct Division on property located at 6705 Carol Road, Baltimore, MD 21207 on or about October 11, 2023.

42. Ms. Richardson's loan documents were signed by loanDepot loan officer Steven Abayon, who worked in loanDepot's Scottsdale, Arizona office at the time Ms. Richardson's loan was originated. Ms. Richardson believes, and therefore avers, that her loan was originated through a Consumer Direct production team that included loan officer Abayon and was supervised by a Production Manager whose compensation was affected by the rates, fees, and pricing concessions associated with loans generated by that team, in the manner alleged above.

43. Because the Production Manager associated with Ms. Richardson's loan participated in loan-origination activities and, upon information and belief, was financially penalized when pricing concessions reduced the price of loans generated by the team, loanDepot's compensation structure created a prohibited incentive for Production Managers to discourage pricing concessions based on the terms of loans originated through the Consumer Direct channel, including Ms. Richardson's loan, regardless of the interest rates or fees ultimately obtained by individual borrowers. Those loans, including Ms. Richardson's loan, were originated and closed in violation of TILA.

44. Plaintiff Robert Pollard obtained a loan from loanDepot through its Consumer Direct Division on property located at 6924 Myersview Drive, Middle River, MD 21220 on or about January 8, 2026.

45. Mr. Pollard's loan documents were signed by loanDepot loan officer Taylor Coric, who worked in loanDepot's Irvine, California office at the time Mr. Pollard's loan was originated.

Mr. Pollard believes, and therefore avers, that his loan was originated through a Consumer Direct production team that included loan officer Coric and was supervised by a Production Manager whose compensation was affected by the rates, fees, and pricing concessions associated with loans generated by that team, in the manner alleged above.

46. Because the Production Manager associated with Mr. Pollard's loan participated in loan-origination activities and, upon information and belief, was financially penalized when pricing concessions reduced the price of loans generated by the team, loanDepot's compensation structure created a prohibited incentive for Production Managers to discourage pricing concessions based on the terms of loans originated through the Consumer Direct channel, including Mr. Pollard's loan, regardless of the interest rates or fees ultimately obtained by individual borrowers. Those loans, including Mr. Pollard's loan, were originated and closed in violation of TILA.

## CLASS ACTION ALLEGATIONS

47. Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals pursuant to Md. Rule 2-231, and the alleged class is defined as follows:

> All individuals in Maryland who, from October 7, 2023 to the present, obtained a residential mortgage loan (as defined in 15 U.S.C. § 1602(dd)(5) of TILA) from loanDepot through its Consumer Direct Division (the "Class"). Exempted from this class is any person who, during the period of October 7, 2023, to the present, was an employee, officer, member and/or agent of loanDepot, and any judicial officer who handles this case, and the immediate family members of such judicial officer(s).

48. There are questions of law and fact common to the claims of each and all members of the Class. These common questions include, but are not limited to:

a. Whether loanDepot and/or its employees and/or agents violated TILA;

b. Whether loanDepot Production Managers engaged in origination activities as defined under the LO Comp Rule;

c. Whether loanDepot paid Production Managers based on the terms of loans closed by the production teams they supervised;

d. Whether Plaintiffs and the Class members are entitled to statutory damages under TILA; and

e. Whether Plaintiffs and the Class members are entitled to attorneys' fees and costs under TILA.

49. These common issues of law and fact, and the common statutory measure of damages under 15 U.S.C. § 1640, predominate over any question affecting only individual Class members.

50. Plaintiffs' transactions and the course of events carried out by loanDepot exemplify and are typical of the unlawful compensation systems designed to maximize loanDepot's profits in violation of the LO Comp Rule.

51. Plaintiffs' damages for the TILA violations are subject to a statutory measure of damages equal to the sum of all finance charges and fees paid by the Plaintiffs, as set forth in 15 U.S.C. § 1640(a)(4). This statutory measure of damages is common to all Class members.

52. Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the named Plaintiffs and all other members of the Class are identical.

53. The Class consists, upon information and belief, of hundreds of borrowers, and thus is so numerous that joinder of all individual members is impracticable.

54. Separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for loanDepot.

55. This action entails questions of law and fact common to Class members that predominate over any question affecting only individual Plaintiffs and therefore a class action is superior to other available methods of fair and efficient adjudication of this litigation.

56. Most Class members are unaware of their rights to prosecute a claim against loanDepot.

57. No member of the Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the Class upon the receipt of notice under Md. Rule 2-231(f).

**COUNT I**
**Violation of the Truth in Lending Act**
**15 U.S.C. § 1639b(c)**

58. Plaintiffs incorporate by reference and reallege the foregoing allegations as though fully set forth herein.

59. At all relevant times, loanDepot was a "person" as defined in 15 U.S.C. § 1602(e) of TILA.

60. At all relevant times, loanDepot's Production Managers and the loan officers they supervised were "loan originators" as defined in 15 U.S.C. § 1602(dd)(2) of TILA in that they are persons, who, for compensation or gain, or in expectation of compensation or gain, took residential mortgage loan applications, assisted consumers in obtaining or applying to obtain residential mortgage loans, or offered or negotiated terms of residential loans to borrowers, including Plaintiffs and the Class members.

61. The Plaintiffs' and Class members' mortgage loans obtained from loanDepot were "residential mortgage loans" as defined in 15 U.S.C. § 1602(dd)(5) of TILA, in that they were consumer credit transactions secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property.

62. loanDepot paid Production Managers, who meet the definition of loan originators, and who include the Production Managers who managed and oversaw the teams and loan officers responsible for originating the Plaintiffs' loans, based on the terms of the loans they and their teams sold to borrowers in violation of TILA, 15 U.S.C. § 1639b(c).

63. As a direct result of this activity, pursuant to 15 U.S.C. section 1640(a) of TILA, Plaintiffs and the Class members are entitled to statutory damages, including:

a. The sum of all finance charges and fees paid by the Class members pursuant to 15 U.S.C. § 1640(a)(4);

**WHEREFORE**, Plaintiffs Regina Richardson and Robert Pollard, individually and on behalf of all Class members, request the following relief against Defendant loanDepot:

1. An Order certifying the proposed Class under Maryland Rule 2-231 of the Maryland Rules of Civil Procedure and appointing the Plaintiffs and their counsel to represent the Class;

2. Demand judgment for Plaintiffs and Class members against loanDepot and award Plaintiffs and Class members an amount equal to:

a. The sum of all finance charges and fees paid by Plaintiffs and the Class members pursuant to 15 U.S.C. § 1640(a)(4);

b. An award of reasonable attorneys' fees and costs of court pursuant to 15 U.S.C. § 1640(a)(3); and

3. Such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Md. Rule 2-325(a), Plaintiffs Regina Richardson and Robert Pollard respectfully request and demand a jury trial on all issues so triable.

Dated: October 8, 2026

Respectfully submitted,

/s/

Michael Paul Smith, Esq. #9212170165
Eric R. Harlan, Esq. #9412140038
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
Email: eharlan@sgs-law.com
*Counsel for Plaintiffs*