# EXHIBIT 5

Ellen R. Boyd
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, D.C. 20006
202.886.5260
eboyd@mitchellsandler.com

***Attorneys for Plaintiff***
***West Capital Lending, Inc.***

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WEST CAPITAL LENDING, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>LOANDEPOT.COM, LLC,<br><br>Defendant. | Civil Action No.<br><br>**DECLARATION OF KEVIN WONG** |

I, Kevin Wong, am over the age of 18 and competent to testify to the following, all of which are within my personal knowledge:

1. I started my employment with loanDepot in 2015 and remained employed in a number of positions until December of 2024. At one point during my employment at loanDepot I was a Production Manager, but I ceased acting in that capacity in and around 2022.

2. Production Managers supervise teams of approximately 10-20 loan officers. Part of a Production Managers' duties is to act as a loan officer on deals that need to be resold due to changes midstream, or in situations when a loan officer is having challenges closing a deal.

3. One of the reasons loan officers escalate a consumer to speak with a Production Manager is because of competition. loanDepot's initial pricing on loans was often higher than competitors. loanDepot's business model was to price loans higher at the outset and then reduce the price as needed to match competitors if and when a customer provided a loan estimate with a lower rate and/or upfront fees.

4. I would routinely be presented with offers from competitors that were giving better rates/fees to borrowers than what loan officers were authori ed to offer. When that happened, my job was to attempt to sell the borrowers at the higher rate initially offered. If I was unsuccessful at selling the higher rate, I was expected to offer the smallest pricing concession possible to get the borrower to move forward.

5. I was financially incented to minimi e the concessions I provided, because the more exceptions I offered and the larger the exceptions I offered, the greater my pay was reduced. In other words, the more and the larger concessions I gave the consumer, the less I would be paid on the loans my team closed.

6. Though I was often required to obtain approval for pricing exceptions, this did not apply to matching loan offers from Rocket Mortgage or West Capital Lending. We were instructed to match or beat the terms offered on such loans even if it meant that loanDepot would lose money on the loan.

7. loanDepot executives often stated that as a public company it had obligations to investors to do things in a lawful and compliant fashion. Therefore, I always believed while I worked at loanDepot its practices and policies were approved from a legal and compliance perspective.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Kevin Wong
Kevin Wong (Mar 4, 2026 10:49:27 PST)

Kevin Wong