# EXHIBIT 7

Ellen R. Boyd
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, D.C. 20006
202.886.5260
eboyd@mitchellsandler.com

***Attorneys for Plaintiff***
***West Capital Lending, Inc.***

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WEST CAPITAL LENDING, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>LOANDEPOT.COM, LLC,<br><br>Defendant. | Civil Action No.<br><br>**DECLARATION OF DAVID HARNED** |

I, David Harned, am over the age of 18 and competent to testify to the following, all of which are within my personal knowledge:

1. I started my employment with loanDepot in 2019 and remained employed in a number of positions until 2024. At one point during my employment at loanDepot, I was a production manager. Though I did not perform that position for the last two years of my employment, I am not aware of any changes to the

position such that my experience outlined below would be substantially different from the job today.

2. Production Managers supervise teams of approximately 10-20 loan officers. They drive sales by coaching and encouraging loan officers under their supervision. They also perform the duties of a loan officer on deals that need to be resold due to changes on the deal, or in situations when a loan officer is having challenges closing a deal.

3. One of the reasons a loan officer might escalate a loan to a production manager is because of competition. loanDepot's initial pricing on loans was often higher than competitors. On almost a daily basis I would be presented with offers from competitors that were giving better rates to borrowers than what loan officers were authori ed to offer. When that happened, my job was to attempt to sell the borrowers at the higher rate initially offered. When I was unsuccessful at selling the higher rate, I was expected to approve the smallest pricing concession possible to get the borrower to move forward.

4. Though it was expected that I would approve pricing concessions when necessary, I was financially incented to minimi e those concessions. In fact, my pay was reduced the more concessions I gave to customers, and the larger the concessions I gave to customers.

5. As a Production Manager, I was expected to maximi e the overall volume of loans while maximi ing loan profitability and if I allowed profitability on loans to drop by improving the rates or fees customers paid to match competitors, then my compensation would be reduced. However, I could not ignore the volume of loans I closed I was absolutely expected and financially incentivi ed to maintain my team's volume. and incented to do so with the highest profitability on loans possible.

6. Though I did not have the ability approve all pricing concessions depending on their si e some required higher levels of approval , when it came to loan estimates provided to consumers by West Capital Lending we were instructed to match or undercut West Capital Lending's offer no matter what. The Company did not want to lose any deals to West Capital Lending even if it meant losing money on the loan.

7. loanDepot represented that as a public company it had to do things in a compliant fashion and that it reviewed its practices and policies with legal counsel. The Company was adamant that it maintained compliant and lawful policies. I always believed while I worked at loanDepot that the practices and policies I followed had been reviewed, approved, and were fully lawful and compliant.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

David Harned

David Harned